IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE CW, LLC, | ) | |
| | ) | |
| Plaintiff/Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08 C 6050 |
| | ) | |
| CARTRIDGE WORLD NORTH AMERICA, LLC, | ) | |
| Garnishee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARTRIDGE WORLD MIDWEST, LLC, | ) | |
| | ) | |
| Defendant/Respondent, | ) | |
| | ) | |
| SIGNATURE BANK, | ) | |
| | ) | |
| Third Party Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

In this supplemental proceeding, One CW, LLC ("One CW") seeks to enforce a judgment against Cartridge World Midwest, LLC (Midwest) entered on December 2, 2008. One CW hopes to satisfy a portion of the debt by recovering money held in Midwest's bank account at Signature Bank and by collecting Midwest's future revenue streams. The proceeding has been complicated by Signature Bank's claim to a priority interest in both the bank account and Midwest's future revenue, and by Midwest's claim to certain statutory protections.

For the reasons discussed below, the court holds that One CW is entitled to collect the money in Midwest's bank account at Signature Bank and a portion of Midwest's future revenue streams.

BACKGROUND

Cartridge World North America, LLC ("CW North America") is a franchisor of "Cartridge World" stores, which refill and remanufacture empty printer cartridges. Respondent Midwest is a Minnesota limited liability company that paid CW North America for the rights to sell Cartridge World franchises in the states of Illinois, Wisconsin, Minnesota, Iowa, North Dakota, and South Dakota. Pursuant to its agreement with CW North America, Midwest sold a Cartridge World franchise to petitioner One CW, which was to be located at 2356 E. Lincoln Highway in New Lenox, Illinois.

A dispute arose between One CW and Midwest regarding the New Lenox franchise, which was resolved by arbitration in One CW's favor and against Midwest for $359,279.00 in damages. On October 22, 2008, One CW filed a petition with this court to confirm that written arbitration award for the $359,279.00 in damages. On December 2, 2008, this court found Midwest to be in default and entered judgment in favor of One CW in the full amount One CW sought.

On December 9, 2008, Midwest pledged all of its assets to third party Signature Bank as a guarantee on two preexisting personal loans made to Steven M. Vollmer ("Vollmer"), President of Midwest, in the amount of $500,000.00 and $150,000.00 respectively. Also on December 9, 2008, Signature Bank filed a UCC-1 Financing Statement with the Minnesota Secretary of State's Office perfecting its security interest in Midwest's assets.

On March 25, 2009, One CW issued citations to discover assets to Midwest, CW North America, and Signature Bank. Noting its troubles gaining compliance with its citations and collecting on the December 2, 2008 judgment, One CW filed a "Motion for Turnover of Assets & for Continuation of Citations Pending Satisfaction of Judgment" with the court on May 1, 2009. (Dkt. No. 18.) Signature Bank and Midwest both opposed this motion, in part on the ground that

Signature Bank has a priority interest in Midwest's assets.

The assets in question include approximately $81,573.28 held in Midwest's bank account at Signature Bank (account number 10011021) and a stream of royalty payments that Midwest receives from CW North America on a monthly basis for 83 Cartridge World franchises located within its territory. On May 28, 2009, the court ordered the parties to brief the question of priority, which the parties have now completed. Pending resolution of this matter, CW North America has agreed to withhold 15% of Midwest's monthly royalty payments until further order of the court. (Dkt. No. 32.)

## ANALYSIS

1. Priority

As the court has previously noted, "all supplementary proceedings in this case are governed by Illinois procedures, unless an applicable federal statute directs otherwise." (5/13/2009 Order, Dkt. No. 25 (citing Fed. R. Civ. P. 69(a) and *Star Ins. Co. v. Risk Marketing Group, Inc.*, 561 F.3d 656, 661-62 (7th Cir. 2009)).) Pursuant to Illinois law, a judgment lien is created in a judgment debtor's nonexempt assets upon proper service of a citation. 735 ILCS 5/2-1402(m). Citations may be served upon either the judgment debtor itself or a third party that is in possession or control of personal property belonging to the judgment debtor. 735 ILCS 5/2-1402(m)(2). Both One CW and Signature Bank agree that service of the citation on Signature Bank was effected on March 27, 2009, thus creating a judgment lien on any of Midwest's assets held by Signature Bank on that date.

However, Illinois law also provides that "[t]he lien established under this Section does not affect the rights of citation respondents in property prior to the service of the citation upon them." 735 ILCS 5/2-1402(m). It is undisputed that Signature Bank perfected its security interest in

Midwest's assets on December 9, 2008, the date it filed a UCC-1 Financing Statement with the Minnesota Secretary of State's Office. Accordingly, Signature Bank argues that, pursuant to 735 ILCS 5/2-1402(m), its rights to Midwest's assets cannot be affected by the judgment lien that was established on March 27, 2009.

Without disputing that Signature Bank has a priority interest in Midwest's assets, One CW argues that Signature Bank's own actions in this matter bar it from asserting that interest against One CW's judgment lien. Citing *S.E.I.U. Local No. 4 Pension Fund v. Pinnacle Health Care of Berwyn LLC*, 560 F. Supp. 2d 647 (N.D. Ill. 2008) (Zagel, J.), One CW argues that Signature Bank is barred from asserting a priority interest in Midwest's assets because Signature Bank failed to exercise its rights to those assets under Signature Bank's security agreement with Midwest.

In *S.E.I.U.*, Judge Zagel looked to the plain language of the security agreement in determining that "[t]he Security Agreement makes clear that [the third-party lender] only takes on the rights of a secured creditor under the UCC *after* a default occurs." *Id.* at 650 (emphasis added). Judge Zagel concluded that "because [the third-party lender] did not declare [the borrower / judgment debtor's] loan in default or follow procedures required by the Security Agreement to enforce its U.C.C. and contractual rights, [the third-party lender] does not have a present right to the funds nor a basis on which to object to their release." *Id.* at 651.

The security agreement in this case contains the same language as the security agreement in *S.E.I.U.* Specifically, the security agreement states:

> *[u]ntil default* and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such

4

Collateral.

(Dkt. No. 29-2, Ex. A at 9), "Grantor's Right to Possession and to Collect Accounts" (emphasis added).) As in *S.E.I.U.*, the security agreement further clarifies that "[i]f an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the [Minnesota] Uniform Commercial Code." (Dkt. No. 29-2, Ex. A at 10, "Rights and Remedies on Default.") One event that constitutes default under the terms of the security agreement is the commencement of foreclosure or forfeiture proceedings by a creditor of Midwest. (*See* Dkt. No. 29-2, Ex. A at 10, "Default. Creditor or Forfeiture Proceedings.")

Unlike the third-party lender in *S.E.I.U.*, Signature Bank did declare Midwest to be in default on the day Signature Bank was served with the citation in this case. (Dkt. No. 48, Ex. A at 1) Since that time, however, Signature Bank has not taken consistent actions to pursue its rights and remedies resulting from Midwest's default. Most importantly, Signature Bank only froze Midwest's assets for five days before allowing Midwest to resume unencumbered use of the account. (Dkt. No. 48, Ex. A at 2) Signature Bank unfroze Midwest's account because the President of Midwest, Steven Vollmer, "assured Signature Bank that [Midwest] was attempting to resolve the dispute with One CW." (Dkt. No. 48 at 4) Signature Bank thus appears to have decided not to enforce its rights and remedies under the terms of the security agreement at that time. *See S.E.I.U.*, 560 F. Supp. 2d at 650-51 ("at any given time many secured loans are technically in default, but are never treated as such by secured creditors" (quotation marks and citations omitted)). Moreover, since April 1, 2009, Signature Bank has taken no steps to enforce its rights to Midwest's assets. *Cf. Martens v. Hadley Memorial Hosp.*, 729 F. Supp. 1391, 1392 (D.D.C. 1990) (Parker, J.) ("The Bank has not accelerated any debt of the Hospital or declared any debt presently due and payable.").

Article 9 of the Uniform Commercial Code, adopted by both Minnesota and Illinois, explicitly notes that an "agreement between the debtor and the secured party which prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect." 810 ILCS 5/9-401(b); Wis. Stat. § 409.401(2). Courts interpreting UCC § 9-401(b)'s predecessor, § 9-311, have held that "the mere declaration of a default in the absence of other affirmative remedial action, such as the acceleration of the loan, does not entitle the secured party to take possession of the collateral." *Martens*, 729 F. Supp. at 1394 (citations omitted). Although the United States Court of Appeals for the Seventh Circuit has not addressed the issue, the Eighth Circuit has set forth persuasive reasoning in holding that a third-party lender cannot, consistent with the UCC, "refuse to exercise its rights under the security agreement, thereby maintaining [the borrower / judgment debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens." *Frierson v. United Farm Agency, Inc.*, 868 F.2d 302, 305 (8th Cir. 1989).

In this case, because Signature Bank has opted not to exercise its rights and remedies in the face of Midwest's default, Signature Bank "does not have a present right to the funds" held in Midwest's account "nor a basis on which to object to their release." *S.E.I.U.*, 560 F. Supp. 2d at 651.

The same reasoning applies to the royalty payments Midwest receives from CW North America. The royalty payments are collateral under the security agreement between Midwest and Signature Bank, but Signature Bank has not taken steps to collect these funds. Instead, Midwest has been allowed the continued use of the royalty payments as they come into the account each month. Having failed to pursue its rights under the security agreement, Signature Bank cannot now object

6

to One CW's demand for those funds.[1]

2. Right to Set-off

In its objections to the citation to discover assets, Signature Bank argues that "the bank accounts owned by [Midwest] which plaintiff seeks to recover are subject to the Bank's rights of set-off and/or off-set in any and all monies in those accounts." (Dkt. No. 29 at 2.) Disputes regarding a respondent's rights to the property discovered in a citation proceeding are governed by the law relating to garnishment proceedings. *See* 735 ILCS 5/2-1402(g). As a "garnishee," Signature Bank "has a right to all demands and set-offs, as against the judgment creditor, that it would have against the judgment debtor." *Obergfell v. Booth*, 218 Ill. App. 492, *1 (1st Dist. 1920); *see* 735 ILCS 5/12-708. However, Signature Bank also must comply with the duties of a garnishee. For example, Signature Bank must "hold, subject to the order of the court any non-exempt indebtedness or other non-exempt property in his or her possession, custody or control belonging to the judgment debtor or in which the judgment debtor has any interest." 735 ILCS 5/12-707(a). Signature Bank also has a duty to file "a written answer under oath to the interrogatories, setting forth as of the date of service of the garnishment summons any indebtedness due or to become due to the judgment debtor and any other property in his, her or its possession, custody or control belonging to the judgment debtor or in which the judgment debtor has an interest." 735 ILCS 5/12-707(b).

Failure to comply with the garnishment proceedings can result in the loss of the statutory right to set-off. *Bee Jay's Truck Stop, Inc. v. Dept. of Revenue of Ill.*, 407 N.E.2d 755, 759 (Ill. App.

---

[1] Signature Bank argues that once it decides to exercise its rights under the default provisions of the loan agreement, its security interest will immediately take priority over One CW's interest. The court takes no position on Signature Bank's argument at this time, as it is speculative in nature, but a counter-argument could be made that Signature Bank's inaction over time has resulted in a waiver of its rights.

7

Ct. 1st Dist. 1980). For example, in *Obergfell* the bank claimed a right of set-off in the amount of $335.93 as payment for a $1,000 loan. 218 Ill. App. at *1. However, the bank lost this right when it failed to apply the $335.93 deposit to the repayment of the loan and instead issued a renewal note in the sum of $1,000, thereby continuing to hold the $335.93 as the property of the judgment debtor. *Id.* at *2-3. Likewise in *Burke v. Congress Hotel Co.*, the employer lost the right to set-off when it failed to actually implement the set-off by adjusting the employee's salary. 280 Ill. App. 493, *4 (1st Dist. 1935). On the other hand, at least one court has excused a bank's failure "to give full details in the garnishment interrogatories concerning its election to exercise its set-off right" where the bank actually exercised its legitimate right to set-off at the time the interrogatories were served. *Bee Jay's*, 407 N.E.2d at 759.

The court finds this case to be closer to *Obergfell* and *Burke* than *Bee Jay's*. Signature Bank has claimed a right to set-off, but has failed to take any steps to actually exercise this right. This, despite the fact that Signature Bank has the right "[a]t any time and even though no Event of Default exists . . . to collect the accounts and to notify account debtors to make payments directly to Lender for application of the indebtedness." (Dkt. No. 29-2, Ex. A at 9, "Grantor's Right to Possession and to Collect Accounts.") Moreover, Signature Bank has not frozen Midwest's assets. The failure to freeze Midwest's assets operates both as a violation of garnishment procedures, thereby disqualifying Signature Bank from claiming a set-off, and as an indication that Signature Bank has no intention of actually exercising its right to set-off.

3. Conditional Liability

One CW claims that Signature Bank failed to comply with the terms of the citation to discover assets and is, therefore, conditionally liable for a portion of the judgment due to One CW.

8

Specifically, One CW claims that Signature Bank failed to file a timely answer and failed to freeze Midwest's account as required by the citation order. The citation to discover assets delivered to Signature Bank prohibited it from "allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment . . . ." (Dkt. No. 18-2, Ex. D at 1) Signature Bank does not seriously contest the fact that it did not permanently freeze the account, nor could it, given the record in this case. Rather it claims that, because it had a prior perfected security interest in the account, it was not required to freeze the assets upon service of the citation.

To support its claim, Signature Bank relies on 735 ILCS 5/2-1402(m), which states that a citation lien "does not affect the rights of citation respondents in property prior to the service of the citation upon them." But that section only refers to the priority of interests between the citation respondent and the judgment creditor; it does not impact the effect of the citation order itself. *See Vendo Comp. v. Stoner*, 438 N.E.2d 933, 938 (Ill. App. Ct. 2d Dist. 1982) (fact that bank holds security interest in treasury notes does not make them exempt from the citation order). The citation order did not ask Signature Bank to independently assess the priority interests of the various parties involved in this case and act as it deemed proper. *See id.* (statute makes "no allowance for the unilateral disposition of such property"). Instead, the citation prohibited Signature Bank from allowing any transfer of "any property not exempt from the enforcement of a judgment . . . ." (Dkt. No. 18-2, Ex. D at 1); *see Vendo*, 438 N.E.2d at 938 ("[T]he legislative scheme clearly requires the citation respondent to hold property of the judgment debtor in its possession in status quo until the judgment creditor's rights can be determined."). Signature Bank does not and cannot claim that the money in Midwest's bank account on March 27, 2009 was statutorily exempt from the enforcement of a judgment. *See* 735 ILCS 5/12-1001 (listing property exempt from judgment). Therefore,

9

Signature Bank was required to hold the money and prevent Midwest from continuing to make withdrawals on the account.

Pursuant to 735 ILCS 5/2-1402(f)(1), if a third party "violates the restraining provision of a citation" the court "may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser." Signature Bank was required by the creation of the judgment lien resulting from the service of the citation on Signature Bank to freeze Midwest's account on March 27, 2009. If the amount of money presently in the account is less than the amount on March 27, 2009, One CW will be injured by Signature Bank's refusal to abide by the citation order. Therefore, Signature Bank is conditionally liable for any money transferred out of Midwest's account after March 27, 2009 to the extent that the funds presently in the account are less than the funds that were in the account on March 27, 2009. This may seem like a harsh judgment, but Signature Bank was not ignorant of the risk it took by refusing to abide by the citation. The citation clearly stated: "WARNING: Your failure to comply with the citation proceeding may result in a judgment being entered against you for the unsatisfied amount of this judgment." (Dkt. No. 18-2, Ex. D at 1)

4. Bad Faith

One CW's claim that Signature Bank violated its duty of good faith under the UCC by taking and perfecting the security interest in Midwest's assets falls short. One CW's basic claim in this regard is that Signature Bank knew about the judgment against Midwest and took the security interest in Midwest's assets in order to shield them from the judgment. One CW argues that Signature Bank should have been suspicious about the offer from Midwest to provide collateral to Signature Bank against a pre-existing personal loan of Midwest's president.

10

Illinois' UCC establishes an obligation of good faith between contracting parties. 810 ILCS 5/1-304. One CW has not identified a single case where the duty of good faith extends to entities that are not parties to the contract. Because One CW and Signature Bank were not contracting parties in this case, Signature Bank did not owe a duty of good faith under the UCC to One CW. *See Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 792 (7th Cir. 1995) ("[U]nder Illinois law the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract. Instead, the covenant merely guides the construction of the explicit terms in the agreement." (quotation marks and citations omitted)).

Even if Signature Bank owed a general duty of good faith to One CW, the evidence that Signature Bank acted in any inappropriate manner in this case is insufficient. Signature Bank had a legitimate interest in securing additional collateral for an under-secured loan and acted to achieve that interest.

5. Royalties

The next issue to concerns the distribution of the royalties CW North America pays to Midwest on a monthly basis for the 83 Cartridge World franchises located within its territory. These royalties are Midwest's sole source of revenue. 735 ILCS 5/2-1402(c)(2) gives courts the authority in supplemental proceedings to:

> Compel the judgment debtor to pay to the judgment creditor or apply on the judgment, in installments, a portion of his or her income, however or whenever earned or acquired, as the court may deem proper, having due regard for the reasonable requirements of the judgment debtor and his or her family, if dependent upon him or her, as well as any payments required to be made by prior order of court or under wage assignments outstanding; provided that the judgment debtor shall not be compelled to pay income which would be considered exempt as wages under the Wage Deduction Statute. The court may modify an order for installment payments, from time to time, upon application of either party upon notice to the other.

The Wage Deduction Statute, 735 ILCS 5/12-801 et seq., in turn, limits to 15% the amount of "wages, salary, commissions and bonuses" subject to collection. 5/12-803.

Midwest requests that, based on these statutes, a maximum of 15% of future royalties be turned over to One CW, with the other 85% paid to Midwest.[2] One CW argues that these statutory protections on future income streams are designed to protect individual debtors and have no application to business entities such as One CW. Therefore, One CW claims that it is entitled to receive 100% of all future royalty payments due to Midwest from CW North America until the judgment is paid in full.[3] To support its argument that the statutory protections only apply to individual debtors, One CW points to the language of 735 ILCS 5/2-1402(c)(2), which states that the court must have "due regard for the reasonable requirements of the judgment debtor and *his or her family*." (emphasis added).

The problem for One CW is that the statute only grants courts the authority to require the judgment debtor to pay to the judgment creditor "a portion of *his or her* income." *Id.* (emphasis added). If, as One CW suggests, 735/2-1402(c)(2) does not apply to businesses, then One CW has no basis, statutory or otherwise, for claiming a right to the future revenues of Midwest. Post-judgment garnishment is not a common law concept, but a statutory creature. The only statute the Illinois General Assembly has seen fit to enact in this regard is 735 ILCS 5/2-1402. There is no legislative statement by the Illinois General Assembly that it intended 735 ILCS 5/2-1402, or the protections provided therein, to apply solely to debtors who are individuals. One CW has not

---

[2] One CW's claim that Midwest has somehow waived these statutory protections is undeveloped and rejected.

[3] As a practical matter, the court does not understand what value One CW sees in driving Midwest out of business before it has finished satisfying its debt.

provided the court with any other post-judgment procedural mechanism by which the court can require CW North America to turn over to One CW the entire royalty stream otherwise due to Midwest. And for good reason – it is clear that 735 ILCS 5/2-1402 was intended by the Illinois General Assembly to apply to business entities. *See* 735 ILCS 5/2-1402(c)(3) (discussing how a judgment creditor may recover property of a corporate judgment debtor wrongfully held by a third party).

Midwest has not provided the court with any case in which a court limited the assignment of the future income of a business entity to 15% because of the Wage Deduction Statute or the "due regard for the reasonable requirements of the judgment debtor" required to be taken by 735 ILCS 5/2-1402(c)(2). On the other hand, One CW has not pointed to any case where a court has been willing to deduct 100% (or any amount more than 15%) of the future revenue of a business until a debt is satisfied. The only case this court found, through its own research, that is even tangentially on point is the unpublished order in *Schwartz v. Yo-Whip, Inc.*, where the parties agreed that 50% of future royalties would be paid to satisfy the debt. No. 92 C. 2586, 1994 WL 549002, at *1 (N.D. Ill. Oct. 5, 1994) (Lefkow, J.). Of course, parties to litigation may stipulate to agreed upon remedies beyond those required by the law, but in this case, the parties so far have been less than agreeable with one another.

Based on 735 ILCS 5/2-1402(c)(2), the court is only authorized to compel "*in installments, a portion* of [the judgment debtor's] income." (emphasis added). This is in clear contrast to 735 ILCS 5/2-1402(c)(1) which authorizes a court to "[c]ompel the judgment debtor to deliver up . . . *in whole or in part*, money . . . in his or her possession." (emphasis added). So under a plain reading of the statute, the court is not authorized to order CW North America to deliver to One CW 100%

13

of the royalties due to Midwest as One CW desires. The court also must have "due regard for the reasonable requirements of the judgment debtor." 735 ILCS 5/2-1402(c)(2).

Based on the record presented and arguments made in this case, the court finds an award to One CW of 15% of Midwest's monthly royalty payments to be appropriate. CW North America has been holding 15% of Midwest's royalty payments according to the court's order on May 21, 2009. CW North America is now ordered to turn that money over to One CW by October 2, 2009 at 4:00 p.m. CW North America is further ordered to turn over to One CW 15% of all future royalty payments due to Midwest until the judgment, including statutory interest, is fully satisfied or until further order of this court.

Midwest is ordered to turn over to One CW 15% of any royalty payments it received from CW North America after the citation to discover assets was served on Midwest and before CW North America started to withhold 15% of the royalty payments pursuant to the court's order. To the extent that these funds are no longer in Midwest's account, Signature Bank is conditionally liable for the difference. Again, it was Signature Bank's choice to take the risk of disregarding the citation order and allow Midwest to continue withdrawing from the account.

6. Attorney's Fees

Finally, One CW's request for attorney's fees is denied.

## CONCLUSION

For the reasons discussed above, Signature Bank's "Motion for Adjudication of Priority Over Royalty Payments" (Dkt. No. 42) is denied; Cartridge World Midwest, LLC's "Motion for Adjudication of Priority Over Royalty Payments (Dkt. No. 43) is granted in part and denied in part; and One CW, LLC's "Motion for Turnover of Assets & for Continuance of Citations Pending

Satisfaction of Judgment" (Dkt. No. 18) is granted in part and denied in part as explained below.

Midwest is ordered to turn over to One CW the amount of money in Midwest's account at Signature Bank on March 27, 2009, believed to be approximately $81,573.28, by no later than October 2, 2009 at 4:00 p.m. Signature Bank is prohibited from objecting to or interfering with this transfer. If any money that was available on March 27, 2009 is no longer available because it has been transferred out of the account, Signature Bank is conditionally liable in that amount. Midwest is further ordered to turn over 15% of the royalty payments it has received from CW North America after the citation to discover assets was served on Midwest and before CW North America started to withhold 15% of the royalty payments pursuant to the court's order. (Dkt. No. 32) To the extent this amount of money is no longer in CW's account at Signature Bank, Signature Bank is conditionally liable. CW North America is ordered to turn over to One CW the royalty payments it has withheld from Midwest pursuant to the court's prior order (Dkt. No. 32). CW North America is further ordered to turn over 15% of all future royalty payments due to Midwest to One CW until the judgment amount is satisfied or until further order of this court. The case remains set for status on September 22, 2009 at 9:00 a.m.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 18, 2009